Anthony Frank SIBLEY

v.

LUTHERAN HOSPITAL OF MARYLAND, INC.

Civ. No. JFM–86–2226.

United States District Court, D. Maryland.

Jan. 5, 1989.

Barry J. Nace, Paulson, Nace & Norwind, Washington, D.C., for plaintiff.

Steven D. Frenkil, Semmes, Bowen & Semmes, Baltimore, Md., and Daniel Moore, Semmes, Bowen & Semmes, Towson, Md., for defendant.

## MEMORANDUM

MOTZ, District Judge.

This is an action for defamation and breach of contract arising from defendant Lutheran Hospital's termination of plaintiff's temporary privileges at the hospital's emergency room and denial to him of regular emergency room privileges.[1] Plaintiff alleges that during the meeting of Lutheran's credentials committee which reviewed his application, defendant Duleep Pradhan, then Chairman of Lutheran's Department of Surgery, made unfounded derogatory remarks concerning plaintiff's performance in the hospital's emergency room while he had been practicing there on his temporary privileges. Plaintiff further alleges that Lutheran unduly delayed the processing of his application for regular privileges and failed to follow its own bylaws in denying him various procedural rights, including a full hearing. Plaintiff seeks compensatory damages of $1,000,000, punitive damages of $2,000,000, costs of this suit, and a grant of emergency room privileges. Lutheran and Pradhan have moved for summary judgment.

## FACTS [2]

On August 6, 1984, plaintiff applied for privileges to practice in the Divisions of Urology and Emergency Services at Lutheran. He requested that he immediately be granted temporary privileges to practice in the Emergency Services Division, and in September 1984 this request was granted. Apparently, under Lutheran's then existing procedure, all that plaintiff needed to show in order to obtain temporary privileges was that he had an M.D., that he had a license

---

1. Plaintiff also asserts claims for negligent withholding and termination of hospital privileges and intentional withholding and termination of hospital privileges. The first of these claims is clearly barred by a provision in the application form signed by plaintiff in which he agreed to "release from liability all representatives of the hospital and its medical staff for their acts performed in good faith and without malice in connection with evaluating my application and my credentials and qualifications...." The second claim—for maliciously not following the hospital's bylaws in various ways in processing

his application—appears merely to be the assertion of a contract claim in the guise of a tort. In any event, for the reasons stated *infra*, plaintiff has not produced sufficient evidence of defendants' motive to withstand their summary judgment motion.

2. Because defendants are moving for summary judgment, the facts will be stated as favorably for plaintiff as the summary judgment record allows.

to practice in Maryland and that he was covered by malpractice insurance.

On October 25, 1984, Lesley Abramowitz, then Chief of the Division of Urology, interviewed Sibley concerning his application for urology privileges. Although, as he testified on deposition, Abramowitz was very impressed by plaintiff, he was concerned about the fact that plaintiff lived in the District of Columbia and might not be able to reach the hospital in the event of an emergency. During the interview Abramowitz questioned plaintiff about his residence but he apparently did not advise him that he should move to the Baltimore area in order to obtain urology privileges at Lutheran.

Abramowitz orally reported his conclusions regarding plaintiff to Pradhan and Lutheran's credentials committee. For approximately eight months thereafter plaintiff's application sat. Apparently, the credentials committee decided that it would not consider plaintiff's application until it had received word that he had established a Baltimore residence. In May or early June of 1985 Pradhan asked Abramowitz for written comments about Sibley's application. By letter dated June 13, 1985, Abramowitz restated his view that plaintiff was "certainly well qualified," but that he was "concerned about the lack of proximity to the hospital interfering with treatment of emergency and post-op cases."

At around this time plaintiff learned that the place of his residence was the reason for the delay in the processing of his application. He arranged to obtain a residence in Baltimore, and by letter dated July 22, 1985 he advised Pradhan that he had done so. On August 1st Pradhan wrote to plaintiff asking whether he would actually be living in Baltimore and where he would be setting up his office. Plaintiff responded on August 4th that "the bulk of my time will eventually be spent residing [in Baltimore]," and that he would stay in Baltimore whenever he had post-operative or otherwise unstable patients. He also in-

formed Pradhan that he had opened an office in Catonsville.

The credentials committee considered plaintiff's application for privileges on September 12, 1985. At this meeting Pradhan mentioned that he had heard of two serious mistakes which had occurred in the emergency room while Sibley was in charge. The first incident involved an alleged misdiagnosis which had almost resulted in a coronary arrest. The second incident concerned the failure to discover by x-ray fluid in the chest cavity of a patient who had suffered a stab wound. According to Pradhan's deposition testimony (which is uncontradicted on the point), he did not tell the committee that what he had heard was true, but only that the incidents had been reported to him. Pradhan also testified that he had reported both incidents to Rafael Aybar, the Director of Medical Affairs. Aybar has testified that he does not recall receiving these complaints from Pradhan.

Pradhan stated, both on deposition and in his answers to interrogatories, that the first incident had been recounted to him by Juan Arrisueno, the head of the surgical intensive care unit, and that he had learned of the second incident from Ashok Agrawal, a surgical house officer. Plaintiff claims that Agrawal told him that he, Agrawal, had not told Pradhan about either of the alleged incidents. According to plaintiff, Agrawal was present when Arrisueno reported one of the incidents to Pradhan. Plaintiff claims that Arrisueno disliked him, partly because plaintiff is black, and that it was generally known in the hospital that Arrisueno was an unreliable source.

The credentials committee voted at its September 12th meeting to recommend that plaintiff be granted courtesy provisional privileges in urology. However, the committee also decided that plaintiff should be denied provisional emergency room privileges and that plaintiff's temporary emergency room privileges should be immediately rescinded.[3] The extent to which (if at

---

**3.** Provisional privileges (as distinct from temporary privileges) placed a doctor upon Lutheran's medical staff. The term "provisional" was used

because initial appointments to the staff were only for a twelve month period.

all) Pradhan's reports contributed to the committee's decisions is not entirely clear from the record. Plaintiff has testified that he was told by various persons that the stories reported by Pradhan played a role in the decisions. The deposition testimony of the members of the credentials committee indicates that the decisions were based upon the fact that during the course of its discussion the committee learned from reviewing plaintiff's application that his only surgical training was in the sub-specialty of urology. This training was not sufficient to qualify as a "full program of training in surgery," as required by the hospital's bylaws.[4]

On September 19, 1985, the medical executive committee adopted the credentials committee's recommendations, and on October 28, 1985 the hospital's board of directors approved the medical executive committee's recommendations. It was not until sometime in November that plaintiff received written notice of the medical executive committee's recommendations. This notice was in violation of the hospital's bylaws in various respects. It was not sent by certified mail; it did not contain a summary of the reasons for the committee's recommendations; and it did not advise plaintiff of his right to request a hearing on the recommendations of the medical executive committee (although it did advise plaintiff that he could obtain a hearing on the decision of the board of directors).

In December, after retaining a lawyer, plaintiff requested a hearing on the decisions made regarding his emergency room privileges. A hearing was scheduled but

some confusion developed concerning its date, and when it did go forward, plaintiff was not present. Lutheran refused to hold a second hearing unless plaintiff agreed to waive his claim that he had been denied due process. Plaintiff refused to agree to this condition.

## DISCUSSION

### Defamation Claim

■ Section 14–601(f) of the Maryland Health Occupations Code provides that a "person who acts in good faith and within the scope of jurisdiction of a medical review committee is not civilly liable for any action as a member of the medical review committee or for giving information to, participating in, or contributing to the function of the medical review committee." Plaintiff acknowledges that under this section he has the burden of proving that Pradhan acted with knowledge of the falsity of what he was reporting to Lutheran's credentials committee or with a reckless disregard for the truth. *See Marchesi v. Franchino*, 283 Md. 131, 387 A.2d 1129 (1978). Plaintiff also concedes that he has the burden of proving Pradhan's malice by clear and convincing evidence. *Cf. New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 597, 350 A.2d 688, 698 (1976).

■ Plaintiff contends that Pradhan's credibility as to what occurred can be attacked on various bases. Thus, for example, plaintiff points to the inconsistency between Pradhan's testimony that he advised

---

**4.** While there is thus a dispute of fact as to whether the stories told by Pradhan played a role in the committee's decisions, this dispute is not a legally material one. It is not germane at all to the question of whether Pradhan's statements were made with malice. Likewise, it is not germane to plaintiff's claims based upon the hospital's violations of its bylaws since plaintiff has offered no evidence to show that the hospital's ultimate decisions would have been different even if what Pradhan reported to the committee had been proved untrue. The evidence that plaintiff offers could, at most, convince a reasonable jury that Pradhan's statements were one of several factors the committee considered in reaching its decisions. Plaintiff has intro-

duced no evidence that could persuade a reasonable jury that his urology training met Lutheran's requirement of a "full program of training in surgery," and, hence, that a hearing would have resulted in a reversal of the committee's recommendation. It is virtually self-evident that plaintiff would never be able to produce evidence that a full hearing would have resulted in such a reversal, since it is highly unlikely that the hospital's board of directors would permit a physician to become a member of the emergency room staff after it had been brought to the attention of the board that he lacked one of the objective qualifications for the position set by the hospital's bylaws.

Aybar of the two incidents which had been recounted to him and Aybar's failure to recall any such report. Likewise, plaintiff notes the inconsistency between Pradhan's recollection that he had been told of one of the incidents by Agrawal and Agrawal's alleged statement to plaintiff that he, Agrawal, was the source of the neither of the stories.[5] According to plaintiff, Pradhan's lack of credibility revealed by such inconsistencies demonstrates that Pradhan, at the behest of Arrisueno, who disliked plaintiff, spearheaded the efforts against plaintiff in the credentials committee. Alternatively, plaintiff argues, Pradhan was reckless in his failure to check the veracity of what Arrisueno had told him in light of Arrisueno's reputation for being an unreliable source.

These facts are far from sufficient to meet the clear and convincing burden of proof carried by plaintiff, and defendants are therefore entitled to summary judgment on the defamation claim. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). There is no independent evidence of any conspiracy to defame plaintiff between Pradhan and Arrisueno (the latter of whom is not even named as a defendant), and the inconsistencies in testimony relied upon by plaintiff fall far short of establishing by inference the existence of any such conspiracy. Absent such a conspiracy, Pradhan is protected from liability by the fact that what he told the credentials committee was true; he had been told of the two alleged incidents of misdiagnosis, and these clearly were germane to the decision before the credentials committee. Indeed, even assuming the facts as plaintiff alleges them to be, Pradhan would have been derelict in his duty if he had not reported to the committee what had been told to him. Ar-

risueno—whom plaintiff contends was the source of Pradhan's information—was the chief of Lutheran's surgical intensive care unit. As such, although plaintiff may choose to characterize Arrisueno as an unreliable source, Pradhan owed it to his professional colleagues and to the hospital's patients to pass on to the credentials committee what he had been told. *Compare Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (finding a convicted felon to be an unreliable source). It might also be noted that the committee does not seem to have been unduly swayed by what Pradhan reported. Although the committee did deny plaintiff emergency room privileges because, at least in part, the committee's examination of plaintiff's application disclosed that he did not possess one of the fundamental objective qualifications for such privileges,[6] it simultaneously approved giving plaintiff provisional courtesy privileges in the urology division.

█ On these facts to submit to a jury the question of whether Pradhan acted maliciously in making his report to the credentials committee would undermine the very purpose of Section 14–601(f) of the Maryland Health Occupations Code. The conditional privilege established by that section embodies the important public policy of protecting the welfare of patients by assuring the free exchange of information during the deliberations of medical review committees. However wronged an individual physician may feel by what was said about him during such deliberations, the law does not permit this free exchange of information to be chilled.

*Claim for Violation of Bylaws*

█ As indicated in the statement of facts, *supra,* it is apparent, at least view-

---

**5.** It may well be that Agrawal's alleged statement to plaintiff is inadmissible hearsay. However, that question need not be decided since even assuming that plaintiff would be permitted to testify concerning it, plaintiff's proffered evidence, taken as a whole, is legally insufficient to establish Pradhan's alleged malice.

**6.** Plaintiff contends that this stated reason was pretextual. In this connection he cites the fact

that on discovery Lutheran did not provide information concerning the qualifications of three of thirty-two doctors who practiced in its emergency room between 1980 and 1985. (The others have been shown by defendants to possess the necessary objective qualifications). Plaintiff clearly cannot meet his burden of proof by the questionable negative inference which he seeks to draw from this fact.

ing the evidence in the light most favorably to plaintiff, that Lutheran repeatedly violated its own bylaws. Under Maryland law it is clear that "hospital bylaws have the force and effect of an enforceable contract." *Anne Arundel General Hospital, Inc. v. O'Brien,* 49 Md.App. 362, 370, 432 A.2d 483, 488 (1981). Therefore, Lutheran is not entitled to summary judgment as to this claim. However, plaintiff has proffered no evidence to show that if the hospital had provided him with a full hearing and otherwise complied with its bylaws, the decisions which it made would have been any different. Therefore, plaintiff can recover only nominal damages on this claim unless he can prove that he turned down other positions which were offered to him because he reasonably believed that Lutheran might reverse its decision if it were to afford him a hearing in compliance with its bylaws. *See Christhilf v. Annapolis Emergency Hospital Association, Inc.,* 552 F.2d 1070 (4th Cir.1977).[7]

A separate order effecting the rulings made in this memorandum is being entered herewith.

## ORDER

For the reasons stated in the memorandum entered herein, it is this 5th day of January 1988

ORDERED

1. The motion for summary judgment filed by defendant Duleep Pradhan as to Counts I, II, III and IV is granted, and judgment is entered in favor of Pradhan against plaintiff;

2. The motion for summary judgment filed by defendant Lutheran Hospital of Maryland, Inc. as to Counts I, II and III is granted, and judgment is entered in favor of Lutheran Hospital of Maryland, Inc. against plaintiff on these counts; and

3. The motion for summary judgment of defendant Lutheran Hospital of Maryland, Inc. as to Count IV is denied.

---

**7.** Perhaps recognizing his inability to recover compensatory damages on this claim, plaintiff has styled the claim as one for "tortious breach of contract" and has demanded punitive damages in connection with it. Although Maryland law does permit recovery of punitive damages "upon proof of actual malice" for a tort related to a contract claim, it does not permit recovery of punitive damages on the contract claim itself. *See, e.g., H & R Block, Inc. v. Testerman,* 275 Md. 36, 338 A.2d 48 (1975); *Wiggins v. North American Equitable Life Assurance Co.,* 644 F.2d 1014, 1017–18 (4th Cir.1981), *Trogner v. New York Life Insurance Co.,* 633 F.Supp. 503, 510 (D.Md.1986).